## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GWENDOLINE ABOAH and TANIA STEWART, | ) | 3:20-cv-00763 (SVN) |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FAIRFIELD HEALTHCARE SERVS., | ) | |
| INC. d/b/a, BRIGHTSTAR CARE OF | ) | |
| FAIRFIELD & SOUTHBURY and | ) | |
| PETER R. MOORE, | ) | |
| *Defendants*. | ) | July 26, 2024 |
| | ) | |

### JOINT RULING ON DEFNDANTS' MOTION FOR SUMMARY JUDGMENT AND TO DECERTIFY THE COLLECTIVE AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

Plaintiffs Gwendoline Aboah and Tania Stewart have sued Fairfield HealthCare Services, d/b/a BrightStar Care of Fairfield & Southbury ("BrightStar") and BrightStar's former President, Peter Moore, seeking to recover unpaid compensation pursuant to Section 16 of the Fair Labor Standard Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the Connecticut Minimum Wage Act ("CMWA"), Conn. Gen. Stat. § 31-58 *et seq.* Plaintiffs, who formerly worked as live-in caregivers for BrightStar, bring three claims. First, they allege BrightStar failed to pay overtime wages owed when it did not include the fair value of food and lodging in the regular rate of pay used to calculate the overtime rate of pay (the "overtime claims"). Second, they contend BrightStar improperly excluded eight hours of sleep time from their pay absent a valid agreement to do so (the "sleep time" claims). Finally, Plaintiffs claim BrightStar improperly excluded three hours of meal/break time from pay absent a valid agreement to do so (the "meal time" claims). In the alternative, if

there was a valid agreement to exclude sleep time and/or meal time, Plaintiffs claim that BrightStar did not pay them for all interruptions to the sleep or meal time periods.

BrightStar, Moore, and Plaintiffs have each moved for summary judgment.  Moore moves for summary judgment on the basis that he was not Plaintiffs' "employer" for FLSA or CMWA purposes.  Def. Moore's Mot. Summ. J., ECF No. 148.  BrightStar moves for summary judgment first on the overtime claims, on the theory that the value of food and lodging should not be included in the regular rate of pay primarily because BrightStar did not to take a credit for that food and lodging, known as the Section 203(m) credit; second, on the basis that BrightStar excluded sleep time and meal time from pay pursuant to a valid agreement; and third, on account of individual deficiencies in Plaintiff Stewart and Plaintiff Aboah's sleep and meal time claims.  Defs.' Mot. Summ. J., ECF No. 149.  BrightStar also seeks decertification of the collective action.  *Id.* Plaintiffs, for their part, oppose Defendants' motion and seek summary judgment as to their contentions that BrightStar erred when it did not add the value of food and lodging to the regular rate of pay before calculating overtime; that BrightStar improperly excluded sleep time from pay absent a written agreement to do so, under the CMWA; and, additionally, that BrightStar cannot establish that it acted in good faith and so is liable for liquidated damages under the CMWA.  Pls.' Partial Mot. Summ. J., ECF No. 150–51.

For the reasons described below, the Court GRANTS Moore's motion for summary judgment, GRANTS IN PART and DENIES IN PART BrightStar's motion for summary judgment, and GRANTS IN PART and DENIES IN PART Plaintiffs' motion for partial summary judgment.  First, there is no genuine dispute that Moore, who attests he retired from the position of President two years before Plaintiffs began employment with BrightStar, may not be considered an employer under either the FLSA or CWMA.  Second, BrightStar erred under the FLSA and

CMWA when it did not include the value of food and lodging in Plaintiffs' regular rate of pay for overtime compensation. Third, there is a genuine dispute regarding whether there was a valid agreement to exclude sleep time under the FLSA, but not the CMWA for which a written agreement is required by law. The Court declines to enter summary judgment in Plaintiffs' favor that BrightStar did not act in good faith with respect to a written sleep time agreement, however. Finally, BrightStar is entitled to partial summary judgment on the meal time claims due to deficiencies with Plaintiffs' individual claims, but Plaintiffs may still pursue a meal time claim on the theory that they did not enter into an agreement to exclude meal time under the FLSA.

## I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed, unless otherwise noted.[1]

BrightStar is a home healthcare company that employed Plaintiff Aboah from about July 19, 2018, to December 8, 2019, and Plaintiff Stewart from June 14, 2018, to July 26, 2020, as live-in caregivers. Defs.' L.R. 56(a)2 St., ECF No. 152-1 ¶¶ 1–2; Pls.' L.R. 56(a)2 St., ECF No. 154 ¶¶ 1–2. Live-in caregivers, as the name implies, are assigned to live with elderly clients to "provide safety services such as fall risk prevention and assist clients with tasks such as cooking, cleaning, bathing, dressing, feeding, and toileting." *Aboah v. Fairfield Healthcare Servs., Inc.*, 662 F. Supp. 3d 192, 200 (D. Conn. 2023).

Plaintiffs were paid $11.00 per hour as their regular rate of pay, and this regular rate was multiplied 1.5 times to calculate the overtime rate of pay of $16.50. Pls.' L.R. 56(a)2 St. ¶¶ 14, 16. During all relevant times, BrightStar paid its live-in caregivers working twenty-four hour shifts

---

[1] Where facts are undisputed, or a denial is not followed by citations to admissible evidence, the Court cites only to the non-movant's Local Rule 56(a)2 Statement. *See* D. Conn. L.R. 56(a). The Court notes that Defendants did not fully comply with Local Rule 56, which requires a *separate* statement of undisputed material facts to be filed along with the motion and supporting memorandum. *See id.* The Court has used the statements of fact set forth in Defendants' memoranda as a substitute for the required separate statements, but advises Defendants' counsel to fully comply with the Court's Local Rules going forward.

at least thirteen hours per day, excluding eight hours for sleep time and three hours for meal/break

time.  *Id.* ¶¶ 3–4.  This policy is explained to new employees during orientation (including through

a PowerPoint presentation) and contained in BrightStar's handbook, which both Plaintiffs

received.  *Id.* ¶¶ 5–6.  The relevant provision reads in pertinent part:

> unless applicable state law requires otherwise, if a non-exempt employee
> works a shift of twenty-four (24) hours or longer, up to eight (8) hours of
> sleeping time can be excluded from compensable working time if all of the
> following apply: a. A voluntary agreement excluding sleeping time exists
> between the Company and the employee; . . . e. Any agreement for the
> treatment of compensable time for live-in employees must meet the
> requirements of federal and applicable state law and be an employer-
> employee agreement, not a unilateral decision by the employer. This
> agreement will be in writing.

Defs.' L.R. 56(a)2 St. ¶ 19.  The handbook also contained a provision stating that:

> THIS HANDBOOK IS NOT A CONTRACT.  BrightStar reserves the right
> to revise, add to or delete any part of this handbook at anytime, as it deems
> necessary, with or without notice.  The benefits, policies and procedures
> outlined in this handbook are subject to change at anytime, at the sole
> discretion of the Company.

*Id.* ¶ 24.

BrightStar's contract with their clients provides that live-in caregivers work for eight hours

per day, sleep for eight hours per night, and have eight hours of leisure time in each twenty-four

hour period.  Pls.' L.R. 56(a)2 St. ¶ 7; Defs.' Ex. G, BrightStar of Fairfield Service Agreement,

ECF No. 149-8 at 2.

It is undisputed that the employee handbook did not constitute a written agreement between

Plaintiffs and BrightStar, and that neither Plaintiff signed a voluntary agreement excluding sleep

or meal time with BrightStar anytime before July 23, 2020.  Defs.' L.R. 56(a)2 St. ¶¶ 25–31; *see*

*also* Ward Dep., ECF No. 151-4 at 23, Tr. 83:1–3, 86:2–3 (testifying, as BrightStar Director of

Operations, that "sleep time was discussed, but if you're asking for a signed sleep agreement, we

did not have that" until BrightStar "added a written sign-off, I believe, in 2019 or 2020"). On July 23, 2020, after this lawsuit was filed, Plaintiff Stewart signed a Live-In Agreement reflecting the policy that "during one 24 hour period you will be working 13 hours, taking a meal break 3 hours, and sleeping 8 hours." Pls.' Ex. 8, ECF No. 151-8; Defs.' L.R. 56(a)2 St. ¶ 29.

Under BrightStar's policy, caregivers generally report their time (and any interruptions to sleep and meal/break time) through the mobile ABS program ("MABS"), although some opt to do so through email or other written correspondence. Pls.' L.R. 56(a)2 St. ¶ 8. Caregivers may also report interruptions through telephone. *Id.* If a live-in caregiver has reported repeated disruptions to sleep, BrightStar will assign a second caregiver to the client to provide services during the night. *Id.* ¶ 13.

BrightStar did not provide any documentation to live-in caregivers stating that they would be furnished with food or lodging, *id.* ¶ 19, though Plaintiffs contend BrightStar assigned Plaintiffs to live in their clients' homes, knowing that the clients would furnish lodging to Plaintiffs. *See id.*; *see also* Pls.' Add'l Mat. Facts, ECF No. 154-1 ¶¶ 1–2; Defs.' Ex. G, BrightStar of Fairfield Service Agreement ECF No. 149-8 at 2 (BrightStar's client agreement providing: "Caregiver spends sleep and leisure time on the client's premises."). Some BrightStar clients also provided live-in caregivers with food. Pls.' L.R. 56(a)2 St. ¶ 17. BrightStar also had a food allowance under which live-in caregivers were able to submit receipts for groceries for reimbursement, up to $10 per day or $70 per week. Defs.' L.R. 56(a)2 St. ¶ 5. Additional facts are set forth as necessary below.

Plaintiff Aboah and Plaintiff Stewart brought the present four-count action in federal court on June 2, 2020, on behalf of themselves and others similarly situated, seeking to recover unpaid overtime compensation under Section 16(b) of the FLSA and the CWMA. Compl., ECF No. 1.

As discussed above, the claims in the operative Second Amended Complaint ("SAC") fall into three general categories:  the overtime claims for failure to include food and lodging in the regular rate of pay; the sleep time and meal time claims based on excluding such periods absent a valid agreement to do so; and the sleep and meal time claims based alternatively on failing to compensate for interruptions to such periods, if in fact there was an agreement to exclude them.[2]  ECF No. 69.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

---

[2] On March 16, 2023, the Court granted in part and denied in part Plaintiffs' motion for FLSA conditional certification and conditionally certified a collective only as to the overtime claims.  Order, ECF No. 83 at 6.  Notice was sent to potential opt-in plaintiffs, but after Plaintiffs' counsel engaged in unauthorized communications, the Court disqualified Attorney Egbarin from serving as counsel for the FLSA collective action, imposed monetary sanctions, and deemed all opt-in forms received to date void.  Order, ECF No. 113 at 13–20.  After a curative notice was sent, no opt-in plaintiffs joined the collective action.  A single individual, Nana Agyare, filed a consent to suit.  ECF No. 122.  Because Agyare did not file a notice of *pro se* appearance, or appearance of counsel, however, she was dismissed from the action.  Order, ECF No. 134.

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial.  It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324).  The non-moving party, to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury finding in his or her favor.  *Anderson*, 477 U.S. at 249.  If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## IV.    DEFENDANT MOORE'S SUMMARY JUDGMENT MOTION

Defendant Moore separately moves for summary judgment, contending that he is not Plaintiffs' "employer" for FLSA or CMWA purposes, and therefore that he cannot be held individually liable for any alleged FLSA or CMWA violation, as alleged in Counts Three and Four of Plaintiffs' complaint.  For the following reasons, the Court agrees that Moore was not an "employer" under either statute.  All claims against Defendant Moore are therefore dismissed.

A.  Legal Standard

The FLSA defines "employer" broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The U.S. Supreme Court has noted that his definition "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  Thus, the Second Circuit and district courts "ha[ve] treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances."  *Barfield v. N.Y.C. Health and Hosps. Corp.*, 537 F.3d 132, 141–42 (2d Cir. 2008).  The standard for who qualifies as an employer under the FLSA is generally referred to as "the economic realities test." *See id.* at 143.

When considering the FLSA liability of an *individual* within a company that itself is undisputedly a plaintiff's employer, the Second Circuit requires courts to examine the individual's level of "operational control" over a company.  *See Irizarry v. Catsimatidis*, 722 F.3d 99, 106–111 (2d Cir. 2013).  "A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment."  *Id.* at 110.  It is not enough to simply be a high-level executive; "a company owner, president, or stockholder must have at least some degree of involvement in the way the company interacts with employees to be a FLSA 'employer.'"  *Id.* at 107.  "[E]vidence showing an individual's authority over management, supervision, and oversight of a company's affairs in general is relevant to the totality of the circumstances in determining the individual's operational control of the company's employment of the plaintiff employees."  *Id.* at 110 (cleaned up).

An individual may also be an "employer" for FLSA purposes if he or she had "potential power," even if there is no "manifestation of" an individual's operational control. *Id.* at 111. To show potential power, "a clear delineation of an individual's power over employees" may suffice. *Id.* An individual may possess potential power when they "unequivocally express[ ] the right to supervise the [plaintiffs'] work, and the [plaintiffs are] well aware that they are subject to such checks as well as to regular review of their [work]," or the individual "made decisions that affected the [plaintiffs'] work." *Id.* (internal quotation marks and citations omitted). Although the Second Circuit discussed the possibility that an individual's potential power could render them an employer under the FLSA in *Irizarry*, it has not conclusively held whether "unexercised authority is sufficient to establish FLSA liability." *See Sethi v. Narod*, 974 F. Supp. 2d 162, 186 n.12 (E.D.N.Y. 2013); *see also Irizarry*, 722 F.3d at 111 (declining to opine whether potential power was enough, since the individual defendant *did* exercise authority).

The Court must also consider the four factors from *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1984), in its assessment of whether an individual is an employer. *See Velasquez v. U.S. 1 Farm Market, Inc.*, No. 3:13-cv-00634-GWC, 2016 WL 2588160 at *8 (D. Conn. May 3, 2016). The four *Carter* factors are: "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter*, 735 F.2d at 12. These factors are not exclusive. *See Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 71–72 (2d Cir. 2003).

The CMWA "employs a somewhat different definition of 'employer' than the FLSA." *Tapia v. Mateo*, 96 F. Supp. 3d 1, 5 (D. Conn. 2015). The CMWA defines employer as an individual or legal entity who "employ[s] any person," Conn. Gen. Stat. § 31-71a(1), or who

"act[s] directly as, or on behalf of, or in the interest of an employer in relation to employees," Conn. Gen. Stat. § 31-58(d).  "In fleshing out this definition, the Connecticut Supreme Court has declined to adopt the 'economic reality test' that applies to the FLSA."  *Lin v. W & D Assocs., LLC*, No. 3:14-cv-164 (VAB), 2015 WL 7428528, at *7 (D. Conn. Nov. 20, 2015) (internal quotation marks and citations omitted).  Instead, for purposes of the CMWA, the term "employer" "encompasses an individual who possesses the ultimate authority and control within a corporate employer to set the hours of employment and pay wages and therefore is the specific or exclusive cause of improperly failing to do so."  *Butler v. Hartford Tech. Inst., Inc.*, 704 A.2d 222, 227 (Conn. 1997).

      B.  <u>Additional Facts</u>

      The following additional facts are relevant to the Court's analysis of Defendant Moore's summary judgment motion.

      Peter R. Moore is the former President of BrightStar.  Pls.' L.R. 56(a)2 St., ECF No. 153 ¶ 1.  He attests that, since the end of January of 2016, he has not been involved in the day-to-day operations of BrightStar, as he became the primary caregiver for his wife.  Moore Decl., ECF No. 148-2 ¶ 3.  At this time, Director of Nursing Evanne Covino became Interim Director of Operations, until Stephanie Ward was hired for the role in November of 2017.  *Id.* ¶ 4.  Moore also attests he formally retired from the position of President in January of 2018, and is currently only Chairman of the Board of Directors.  *Id.* ¶¶ 6–7.

      The January 2018 retirement occurred before either Plaintiff Aboah and Plaintiff Stewart began working for BrightStar in July of 2018, and June of 2018, respectively.  *Id.* ¶ 8.  Moore attests that he played no role in hiring or supervising either Plaintiff.  *Id.* ¶¶ 9–10.  Plaintiff Aboah and Plaintiff Stewart both testified that they never discussed any wage or hour concerns with Moore.  *See* Def. Moore's Ex. B, Pl. Aboah's Interrog. 2, ECF No. 148-3 at 6 (not identifying

Moore as someone with whom she communicated about wage and hour issues); Def. Moore's Ex. C, Pl. Stewart's Interrog. 2, ECF No. 148-4 at 7–8 (same).

    C.  <u>Discussion</u>

        *1.  "Employer" Under the FLSA*

There is no genuine dispute of fact as to whether Moore was Plaintiffs' employer under the FLSA, so Moore is entitled to summary judgment as to Count Three of the SAC.  In contending that Moore was their employer, Plaintiffs primarily cite to (1) a Connecticut Secretary of State filing that lists Moore as the CEO of BrightStar as of August 31, 2023, Pls.' Ex. 1, Conn. Sec. of State Filing, ECF No. 153-2 at 2; (2) a 2017 BrightStar handbook identifying Moore as the President and Owner of BrightStar and reserving certain rights to the CEO, Pls.' Ex. 2, Handbook, ECF No. 153-3 at 4; and (3) deposition testimony from Stephanie Ward, Pls.' Ex. 4, Ward Dep., ECF No. 153-5.  *See* Pls.' Add'l Mat. Facts, ECF No. 153-1.  None of these pieces of evidence, either alone or in combination, would allow a reasonable jury to conclude that Moore exercised operational control or potential power over Plaintiffs' employment.

To start, the Connecticut Secretary of State filing is inadmissible for lack of authentication under Federal Rule of Evidence 901, as Plaintiffs have not filed an affidavit authenticating the document's source.  Even if it were authenticated, the filing would be inadmissible as hearsay under Federal Rule of Evidence 802.  Plaintiffs are introducing this record for the truth of the matter asserted therein:  that Moore was the CEO of the company as of the date of the document. This is textbook hearsay, and Plaintiffs have not identified any applicable hearsay exception.  The Court therefore will not consider the Secretary of State's listing of Moore as CEO in August of 2023 for purposes of Moore's motion.  *See* Fed. R. Civ. P. 56(c); *Raskin v. Wyatt*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a

motion for summary judgment").   The remaining evidence before the Court regarding Moore's title appears only his declaration, in which he attests that he was formerly the President of BrightStar, but has not been involved in the day-to-day operations of the company since January of 2016, and formerly retired from the position of President in January of 2018.  Moore Decl. ¶¶ 2–3, 6.  Moore states that he currently serves as Chairman of the Board, where his role is "limited to approving strategy and chairing Board meetings."  *Id.* ¶ 7.[3]

The deposition testimony of Stephanie Ward does not create a genuine issue of material fact as to whether Moore was Plaintiffs' employer.   As Director of Operations, Ward was responsible for scheduling, human resources, payroll, recruiting, and accounts payable and receivable.  Ward Dep., ECF No. 153-5 at 4, Tr. 27:7–19.  When asked "who did you report to at BrightStar," Ward answered "I report to [Managing Director] Tom Gilday" on the day of her deposition testimony, July 28, 2021.  *Id.* 27:20–28:2.  When asked "[w]ho else did you report to at BrightStar," she answered, "I reported to Peter Moore and Maureen Moore." *Id.* 28:19–21.  This testimony is vague as to timing.  Ward was asked at a high level to whom she reported over the course of her five-year tenure at BrightStar.  Although she testified that she reported to Moore and his wife, there is no basis to infer that this included *after* Moore's retirement in January of 2018.  Plaintiff argues that Ward reported to Moore "prior to and after June of 2020," *see* Pls.' Opp. Br., ECF No. 153 at 12, but the underlying deposition testimony to which Plaintiff cites for this assertion does not discuss these timeframes in any way.  *See* Pls.' Add'l Mat. Facts ¶¶ 8, 11–12.  More fundamentally, that Ward may have reported to Moore at some period of time does not

---

[3] Moore also cites Plaintiffs' discovery responses requesting all documents supporting Plaintiffs' contention that Moore actively manages, supervises, and directs the day-to-day operations of BrightStar, which listed two website links containing alleged online profiles for Moore: one from Dun & Bradstreet and another from LinkedIn.  *See* Pl. Aboah's First Disc. Resp., ECF No. 148-5 at 3–4; Pl. Stewart's First Disc. Resp., ECF No. 148-6 at 3–4.  Plaintiffs did not provide these online profiles to the Court in any form, much less authenticated form, so the Court does not consider them for purposes of Moore's motion.

demonstrate that Moore necessarily exercised operational control, or even potential power, over Plaintiffs Aboah and Stewart when they worked for BrightStar in the period of mid-2018 through 2020.

Nor does the relevant portion of the 2017 BrightStar handbook provide evidence from which a reasonable jury conclude that Moore exercised at least potential control over Plaintiffs' employment.  The handbook states:  "No one at BrightStar including its officers has the authority to alter, revise, amend or revoke any BrightStar policy or to make contractual commitments to any employee without the written consent of the CEO of BrightStar";  and "[o]nly the CEO of BrightStar has the authority to make such an agreement modifying the at-will status of any employee or promising conditions or benefits that differs from any provision of this handbook." ECF No. 153-3 at 5–6.  There is no evidence in the record suggesting that Moore exercised the authority reserved to the CEO in the 2017 handbook while he held the CEO role, with respect to Plaintiffs or any other employee.  And although the 2017 handbook references the CEO's theoretical ability to modify employment contracts, and therefore is an example of the potential power the company's CEO could have wielded, there is again no admissible evidence in the record contradicting Moore's assertion that he retired from the position of CEO in January of 2018, six months before either Plaintiff became employed by BrightStar.

Considering the totality of the circumstances, there is an absence of evidence from which a reasonable jury could conclude that Moore exercised operational control, such as making decisions that "directly affect[ed] the nature or conditions of the [Plaintiffs'] employment." *Irizarry*, 722 F.3d at 110.  Plaintiffs also have not put forth evidence that Moore "unequivocally expressed the right to supervise [Plaintiffs'] work" or that Plaintiffs were "well aware that they are subject to such checks as well as to regular review of their [work]" by Moore, which could

demonstrate his potential power over their employment. *Id.* Indeed, Plaintiffs attempt to designate Moore as their "employer" for FLSA purposes appears to be based only on his title, which *Irizarry* explicitly prohibits. *Id.* at 111; *see also Juarez v. Precision Apparel, Inc.*, No. 12-CV-2349 (ARR) (VMS), 2013 WL 5210142, at *6 (E.D.N.Y. Sept. 13, 2013) ("A defendant's status as CEO does not, in itself, qualify a defendant as an employer under the FLSA").

Examination of the *Carter* factors reinforces the conclusion that Moore is not an individual employer under either the operational control or potential power test. Under the first factor, Plaintiffs have not pointed to evidence that Moore possessed the "the power to hire and fire employees" during the term of Plaintiffs' employment with BrightStar, from mid-2018 through 2020. *See Carter*, 735 F.2d at 12. There is also no evidence Moore "supervised and controlled employee work schedules or conditions" or "determined the rate and method of payment" during that period. *See id.* Further, Plaintiffs concede Moore did not maintain employment records. Pls.' L.R. 56(a)2 St. ¶ 11. For these reasons, the *Carter* factors support the Court's conclusion. *See Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 464–65 (S.D.N.Y. 2015) (finding that CEO of restaurant was not the plaintiffs' employer under the FLSA).

Considering the totality of the circumstances and the admissible evidence before the Court, Plaintiffs have failed to demonstrate a genuine issue of material fact concerning whether Moore acted as Plaintiffs' employer for purposes of his individual liability under the FLSA. Moore is therefore entitled to summary judgment on Count Three of Plaintiffs' SAC.

### 2.  *"Employer" under the CMWA*

The Court similarly grants Moore's summary judgment motion as to Count Four of Plaintiffs' SAC, alleging that he was an "employer" under the CMWA. Moore seems to concede that, prior to his formal retirement in January of 2018, he possessed the "ultimate authority and

control to set the hours of employment and pay wages."  Def. Moore's L.R. 56(a)1 St. ¶ 12; *see*

*Butler*, 704 A.2d at 227.  After that point, however, his duties were formally transferred to Ward

as the Director of Operations, until Gilday was hired as Managing Director in June of 2020.  *Id.*

There is an absence of evidence that, after the formal retirement, Moore continued to possess that

authority while either Plaintiff Aboah or Plaintiff Stewart were working for BrightStar.

Plaintiffs must rely on a theory that Moore did not actually retire in January of 2018.  But,

as described above, Plaintiffs have not put forth any admissible evidence contradicting his

assertions that he did.  The Connecticut Secretary of State filing is inadmissible, and the Court

does not consider the links to unauthenticated online profiles Plaintiffs have not put before the

Court.  Ward's deposition testimony is also too vague as to timeframe to create a genuine dispute

of material fact.

For these reasons, Moore may not be held liable as an individual employer under the

CMWA.  The Court therefore grants Moore's motion for summary judgment in its entirety, and

dismisses Moore from this action.

The Court considers Plaintiffs' and BrightStar's remaining motions for summary judgment

below.

### III.    OVERTIME, SLEEP TIME, AND MEAL TIME CLAIMS

The Court addresses Plaintiffs' overtime, sleep time, and meal time claims in turn, as these

claims are implicated in both Plaintiffs' and BrightStar's summary judgment motions.  As to

overtime claims, the Court holds that the value of food of lodging must be included in the "regular

rate" of pay used to calculate overtime compensation under the FLSA and CMWA.  BrightStar

erred when it indisputably did not do so.  As to sleep time claims, the Court holds there is a genuine

dispute whether there was a valid agreement to exclude sleep time under the FLSA.  But summary

judgment is granted in Plaintiffs' favor with respect to the CMWA claim, because there was no written sleep time agreement as required by state law. There is a genuine dispute, however, whether BrightStar acted in good faith in this regard. Finally, as to meal time claims, the Court holds that BrightStar is entitled to summary judgment with respect to purported interruptions to Plaintiffs' meal periods. But Plaintiffs may pursue meal time claims on the theory that that they did not enter into a valid agreement to exclude such time from pay under the FLSA.

### A. Overtime Claims

Plaintiffs allege that BrightStar failed to pay them appropriate overtime wages because it did not account for the value of the lodging and meals provided by their clients when determining their regular rate of pay and, as a result, their corresponding overtime rate of pay. For the reasons set forth below, the Court agrees with Plaintiffs.

### 1. "Remuneration" under the FLSA

It is blackletter law that employees must be paid one and one-half times the "regular rate" they are paid during regular working hours for all hours worked over forty in a week. 29 U.S.C. § 207(a)(1). This requires determining what the "regular rate" is. Section 207(e) of the FLSA defines the "regular rate" as "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. 207(e).[4] The question in this case is whether the food and lodging provided to live-in caregivers is "remuneration," and therefore must be included in the "regular rate" of pay.

The FLSA was a landmark piece of legislation passed in 1938 that "show[ed] an intent on the part of Congress to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being[.]" *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 202 (2d Cir. 2015) (quoting *Brooklyn Sav. Bank v. O'Neil*,

---

[4] Section 207(e) sets forth several exceptions that are not at issue here. *See* 29 U.S.C. § 207(e)(1)–(8).

324 U.S. 697, 706 (1945)).  A key protection was the right to overtime pay at one-and-one-half times the regular rate.  Over the past several decades, the U.S. Supreme Court and Second Circuit "have long-recognized the FLSA's underlying purpose:  'to extend the frontiers of social progress by insuring to all our [ ] working men and women a fair day's pay for a fair day's work.'"  *See id.* at 206 (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)).

The FLSA did not always apply to live-in caregivers, however.  At the time it was passed, the FLSA contained a carveout exempting "domestic service" employees from its minimum wage and overtime requirements.  U.S. Dep't of Labor ("DOL"), Application of the FLSA to Domestic Service, 78 Fed. Reg. 60454 (Oct. 1, 2013) (codified at 29 C.F.R. Part 552).  Congress amended the Act in 1974 to extend its protections to all domestic service workers except those who provide "companionship services," and, relevant here, who live in the households in which they provide services.  *Id.*  Congress intended to exclude casual "'elder sitters' whose primary responsibility was to watch over an elderly person . . . in the same manner that a babysitter watches over children"—not "trained personnel such as nurses, whether registered or practical."  *Id.* (quoting first, 119 Cong. Rec. S24773, S24801 (daily ed. July 19, 1973), and second, S. Rep. No. 93-690, 93rd Cong., 2d Sess., at 20 (1974), H.R. Rep. No. 93-690, 93rd Cong., 2d Sess., at 20 (1974)).

The DOL's regulations remained "substantially unchanged" from 1975 to 2013, when they were amended to extend the FLSA's protections to live-in caregivers, in recognition that the home care industry had undergone "dramatic expansion and transformation," requiring "professional caregivers" performing "increasingly skilled duties," rather than "elder sitters."  78 Fed. Reg. 60455.  Specifically, 29 C.F.R. § 552.109 was amended to preclude third-party employers (such as home-health care agencies) from claiming the live-in domestic services employee exemption from the FLSA.  *See id.*  DOL began enforcing this final rule on November 12, 2015.  *See Alves*

*v. Affiliated Care of Putnam, Inc.*, No. 16-CV-1593 (KMK), 2022 WL 1002817, at *2 (S.D.N.Y. Mar. 30, 2022) (summarizing pre-enforcement litigation over the rule).

Since the FLSA's protections were extended to live-in caregivers in 2015, significant questions have arisen regarding how the FLSA's various provisions apply to this previously excluded category of workers. Specifically here, the Court is tasked with deciding whether food and lodging provided to live-in caregivers qualifies as "remuneration" under Section 207(a)(1). The Court finds that it does, given the plain meaning of the term "remuneration," other relevant statutory provisions, and guidance from the Department of Labor.

"Remuneration" is not defined in the FLSA. The Court's starting point for interpreting a statutory term not itself defined in the statute is "the ordinary, common-sense meaning of the words." *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016) (quoting *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000)). Merriam-Webster defines "remuneration" broadly as "something that remunerates," as in "to pay an equivalent for a service, loss or expense." Merriam-Webster, https://www.merriam-webster.com/dictionary/remuneration?src=search-dict-hed (last accessed July 24, 2024). The U.S. Supreme Court has considered the plain meaning of "remuneration" in different contexts and held that the term "[o]f course . . . can encompass any kind of reward or compensation, not just money." *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 278 (2018) (citing 8 Oxford English Dictionary 439); *see also Pfizer, Inc v. U.S. Dep't of Health and Human Servs.*, 42 F.4th 67, 75 (2d Cir. 2022) (noting that "the plain meaning of remuneration" is "[p]ayment; compensation, esp[ecially] for a service that someone has performed" (citing Black's Law Dictionary (11th ed. 2019)). In considering the already broad meaning of "remuneration," the Court is also guided by Supreme Court and Second Circuit precedent that the FLSA's provisions are to be "interpreted . . . liberally" to give "its protections

exceptionally broad coverage" "[i]n service of the statute's remedial and humanitarian goals." *See Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 285 (2d Cir. 2008) (collecting Supreme Court cases).

Lodging provided to live-in caregivers fit comfortably within the common-sense meaning of "remuneration"; the cost of lodging for live-in caregivers is paid "on behalf of" the caregiver, *see* 29 U.S.C. § 207(e), so that the caregiver can reside at the client's home and assist the client at whatever times of the day the client needs assistance. The lodging may be enjoyed during working hours, or while caregivers are off the clock during their meal and sleep time. *See* Defs.' Ex. G, BrightStar of Fairfield Service Agreement, ECF No. 149-8 at 2 ("Caregiver spends sleep and leisure time on the client's premises."). Although being a live-in caregiver is demanding, a major benefit is having a place to live without needing to expend additional funds. So, too, can food provided by a live-in caregiver's client be considered a payment for the caregiver's services, allowing caregivers to forgo buying their own groceries. BrightStar has pointed to no authority suggesting the word "remuneration" in the live-in caregiver context is limited to simply cash wages.

In an analogous case, then-District Judge Gerald Lynch held that food and lodging must be included when calculating an employee's "regular rate" of pay under the FLSA, because it qualifies as "remuneration" under a straightforward reading of Section 207(e). *Moon v. Kwon*, 248 F. Supp. 2d 201 (S.D.N.Y. 2002). In *Moon*, it was undisputed that the employer hotel had provided the plaintiff maintenance worker with both lunch and dinner, and that the plaintiff received free lodging by sleeping in the hotel. *See id.* at 212–14. Unlike the food, for which there was a reimbursement program, it was disputed whether the sleeping arrangement was at the hotel's insistence, or the plaintiff's request. After a bench trial, the court could not find that the plaintiff was "required" to stay in the hotel overnight. *See id.* at 213. Sleeping at the hotel therefore did

not qualify as overtime hours worked.  *See id.* at 214.  Nonetheless, Judge Lynch concluded that

"[t]he fact that [plaintiff] received free lodging and slept at the hotel [was] relevant to the amount

of his regular compensation."  *Id.*  Citing to Section 207(e) and other authorities, Judge Lynch

concluded that the "reasonable cost or fair value or all meals and lodging provided by an employer

must be added to the cash wages when calculating an employee's regular rate."  *Id.* at 230.  The

Court applies the same straightforward reading of Section 207(e) to this case.

Further, Section 203(m) of the FLSA reinforces the conclusion that food and lodging

provided to live-in caregivers fall under the definition of "remuneration."  Section 203(m) of the

FLSA provides that wages "paid to any employee include the reasonable cost . . . to the employer

of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other

facilities are customarily furnished by such employer to his employees."  29 U.S.C. § 203(m).  By

definition, lodging must be furnished for live-in caregivers to complete their job.  Food, while it

need not always be provided, often is.  Food and lodging are therefore "customarily furnished"

and must be included when calculating wages under Section 203(m).[5]

The Court rejects BrightStar's argument that food and lodging is not "remuneration"

because there was no agreement between it and Plaintiffs that "regarded" food and lodging as part

of the live-in caregivers' compensation.  Chapter 29 of the Federal Code of Regulations, Section

778.116, provides that:

> Where payments are made to employees in the form of goods or facilities
> *which are regarded as part of wages*, the reasonable cost to the employer
> or the fair value of such goods or of furnishing such facilities must be
> included in the regular rate. (See part 531 of this chapter for a discussion as
> to the inclusion of goods and facilities in wages and the method of

---

[5] That BrightStar's elderly clients furnished the lodging and food to the live-in caregivers is of no moment, as DOL regulations allow home healthcare agencies to take credit for the value of food and lodging provided by the agencies' clients, as described further below.  *See* DOL, Field Assistance Bulletin No. 2015-1, Credit toward Wages under Section 3(m) of the FLSA for Lodging Provided to Employees, Section 6 (Dec. 17, 2015), https://www.dol.gov/agencies/whd/field-assistance-bulletins/2015-1 (last accessed July 24, 2024).

determining reasonable cost.) Where, for example, an employer furnishes lodging to his employees in addition to cash wages the reasonable cost or the fair value of the lodging (per week) must be added to the cash wages before the regular rate is determined.

29 C.F.R. § 778.116 (emphasis added). BrightStar takes the position that there must be an agreement by both parties to include food and lodging for these items to be "regarded" as part of live-in caregivers' wages under this provision, and contends that it did not agree to such an arrangement. In support of its argument, BrightStar cites to one out-of-circuit appellate case, *Secretary United States Department of Labor v. Bristol Excavating, Inc.*, 935 F.3d 122, 135 (3d Cir. 2019), in which the Third Circuit held that bonuses paid to the plaintiffs by a third-party were not considered "remuneration" under the FLSA unless the employer and employees agreed that they would be, and two district court opinions, *Nqadolo v. Care at Home, LLC*, No. 3:22-cv-612 (KAD), 2023 WL 3846309 (D. Conn. June 6, 2023) (noting, in the context of a motion to strike allegations from a complaint, that "[w]hether lodging and board are included in the wage calculation depends on the agreement between the employer and employee"), and *Anderson v. Theriault Tree Harvesting, Inc.*, No. 08-330-B-W (MJK), 2010 WL 323530 (D. Me. Jan. 20, 2010) (holding where parties did not agree or understand that the employee's use of a camp would affect the employee's wages, the provision of lodging was "not material to the employment contract and is outside the parties['] mutual contemplation concerning compensation"). As discussed further below, none of these cases is binding authority.

Absent definitive guidance from the Second Circuit on this issue, the Court is not prepared to hold that, in the particular scenario involving a live-in caregiver and her home care agency employer, there must be a formal agreement between the live-in caregiver and a home care agency for client-provided lodging and food to be "remuneration" under 29 U.S.C. § 207(e). To the extent 29 C.F.R. § 778.116 informs the Court's reading of 29 U.S.C. § 207(e), food and lodging are

comfortably "regarded" as part of the live-in caregiver's wages here.  There is no dispute here that BrightStar knew that its clients were furnishing lodging and, in many instances, food, to live-in caregivers.  Lodging, in particular, was a necessary part of Plaintiffs' employment with BrightStar, customarily furnished to these types of workers so that they could serve their intended function of assisting elderly clients around-the-clock whenever necessary.  The very purpose of Plaintiffs' jobs was to *live* with the client, which had the benefit of sparing them the expense of alternate housing.  Under this particular type of employment scenario, it is unnecessary to require an explicit agreement between the employer and employee in order to "regard[]" the cost of lodging and food as part of the employee's wages.  29 C.F.R. § 778.116.

Central to BrightStar's argument is that it did not take what is known as a Section 203(m) credit.  Pls.' L.R. 56(a)2 St. ¶ 21.  Under Section 203(m), an employer may "credit" the value of food and lodging provided to its employees against its minimum wage obligations.  That is, an employer may pay an employee below the minimum wage in cash wages, because it can count the value of food and lodging provided to the employee to make up the deficiency below the minimum wage.  It is undisputed that BrightStar did avail itself of a 203(m) credit; that is, it did not adjust Plaintiffs' hourly rate downward based on the provision of client-provided food and lodging, although it would have been in its financial interest to do so.  BrightStar argues this conclusively shows that food and lodging were not "regarded" as part of Plaintiffs' wages.  But for the reasons described above, BrightStar cannot avoid the requirement to include food and lodging in the regular rate of pay, for live-in caregivers specifically.  The Court understands that its ruling here creates an incentive for home healthcare agencies to always take the Section 203(m) credit for the value of food and lodging provided by clients, thereby potentially reducing live-in caregivers' cash wages.  But this is in fact the intended consequence of the scheme.  The Section 203(m) credit is

designed to benefit employers like BrightStar. It exists exactly because food and lodging are considered part of the benefits live-in caregivers receive as part of their job.

The 2015 DOL Field Assistance Bulletin applying the Section 203(m) credit to live-in caregivers confirms that food and lodging qualify as "remuneration," and must be included in the regular rate of pay. The Bulletin states that home healthcare agencies may credit the value of room and board provided by clients towards their live-in caregivers' wages. DOL, Field Assistance Bulletin No. 2015-1, Credit toward Wages under Section 3(m) of the FLSA for Lodging Provided to Employees, Section 6 (Dec. 17, 2015), https://www.dol.gov/agencies/whd/field-assistance-bulletins/2015-1 (last accessed July 24, 2024) ("In such circumstances, all employers may take credit towards their joint wage obligation for housing costs paid by any of them."); *see also id.* ("It is not uncommon for a consumer and home care agency to jointly employ a live-in domestic service employee, and for the employee to receive cash wages from the agency and housing from the consumer."). It even provides an example of how a home healthcare agency like BrightStar would calculate the regular rate of pay after taking a Section 203(m) credit for the value of room and board provided by the client. *See id.* at Section 5: Wage Calculations. Such a credit makes sense only if room and board is considered a fundamental benefit of working as a live-in caregiver. That BrightStar did not opt to take a 203(m) credit in this instance was its choice, and does not change the Court's conclusion that the value of the lodging and food should have been counted as

"remuneration" to Plaintiffs, and therefore utilized in their regular and, as a result, overtime rates of pay.[6]

The Court respectfully disagrees with *Nqadolo*, to the extent it held that "[w]hen an employer does not take a § 203(m) credit and does not deduct the costs of lodging or board from an employee's pay, there is compelling and conclusive evidence that lodging and board were not agreed upon part of the [live-in caregivers'] compensation package."  2023 WL 3846309, at *7. Drawing on cases outside of the live-in caregiver context, *Nqadolo* reasoned that because employers retain discretion over whether or not to take a Section 203(m) credit, there must be an agreement between employers and employees before the value of food and lodging is included in live-in caregivers' wage calculation.  *See id.*  Respectfully, this Court does not believe that such a rationale adequately addresses the plain meaning of "remuneration," the purpose of Section 203(m), or live-in caregivers' unique situation.  Although there is no documentation of a formal agreement, BrightStar assigned live-in caregivers to the homes of their clients *knowing* that lodging would necessarily be provided, and that food would be in many scenarios.

*Anderson*, on which *Nqadolo* relied, concerns a different industry and is therefore inapposite.  There, a tree harvesting company provided one of its employees lodging in a logging camp after he was found sleeping in his truck.  *See Anderson*, 2010 WL 323530 at *3.  Sleeping at the logging camp saved the employee some time on his commute, but it was not necessary for the performance of his job:  harvesting trees the next day.  *See id.*  Accordingly, the court was "not

---

[6] The Court recognizes that the 2015 DOL Field Assistance Bulletin states that, if an "employee provides round-the-clock care, or if the employee's sleep or off-duty time is regularly interrupted to perform work for the employer, the lodging typically will be deemed as primarily for the benefit of the employer," and a Section 203(m) credit may not be available to the employer.  FAB No. 2015-1 at Section 1(iv).  The Bulletin also identifies, however, that "circumstances can change over time and the credit may be available at a later date."  *Id.*  And BrightStar's client agreement provides that, "[i]f the client requires continuous overnight care, or regularly gets up frequently (more than twice) in the night, the service does not meet Live-In criteria and hourly caregivers may be required."  ECF No. 149-8 at 2.  The 203(m) credit, therefore, could still be available to BrightStar under the Field Assistance Bulletin's criteria.

persuaded that 29 U.S.C. § 203(m)        . . . mandate[s] that the cost of lodging be included in a regular rate calculation when the provision of lodging is not material to the employment contract and is outside the parties' mutual contemplation concerning compensation." *Id.* at *12.  By contrast, for live-in caregivers, sleeping in the client's home is necessary for performance of the job itself.

Similarly, the Third Circuit's decision in *Bristol Excavating* involved a different factual scenario than that at issue here:  whether incentive bonuses paid by a third-party company to excavation company employees qualified as "remuneration."  935 F.3d at 129.  Its holding therefore is not persuasive in the particular factual scenario present here involving live-in caregivers.    Further,  the  bonuses  at  issue  reflected  one  of  the  statutory  exceptions  to "remuneration": "[s]ums paid in recognition of services performed during a given period if . . . both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any contract, agreement, or promise, causing the employee to expect such payments regularly."  29 U.S.C. § 207(e)(3).  In contrast, lodging and food are not an unexpected "bonus" for live-in caregivers.

The Court acknowledges that, unlike lodging, food is not *always* provided to live-in caregivers.  But when it is, it is remuneration as a matter of law for the reasons described above.  Sharing meals with the client is a benefit that individual live-in caregivers customarily receive as part of their job, allowing them to forgo buying their own groceries.  Because it is such a benefit, the Section 203(m) credit allows employers to take advantage of the value of food, when it is so provided, in addition to the value of lodging.  *See* 29 U.S.C. § 203(m); DOL, Field Assistance Bulletin No. 2015-1, Credit toward Wages under Section 3(m) of the FLSA for Lodging Provided to  Employees,  n.2  (Dec.  17,  2015),  https://www.dol.gov/agencies/whd/field-assistance-

bulletins/2015-1 (last accessed July 24, 2024) (describing how meals provided counts towards home health care agencies' minimum wage obligations). Indeed, BrightStar offered a grocery reimbursement program, presumably in the event that food was *not* provided by clients—confirming that food is a benefit often enjoyed by live-in caregivers. That live-in caregivers may be required to, in some instances, buy their own groceries without reimbursement does not mean that, when they *are* reimbursed for groceries or share meals with their client as a matter of course, it not a benefit.[7]

Because food is not always provided, calculating the value of food to be included in the regular rate of pay may be a more difficult task than calculating the value of lodging. *Cf.* Revised Joint Guidance Issued by DSS and CTDOL Regarding USDOL's Home Care Final Rule, ECF No. 151-7, at 2 ("[F]ood must also be calculated on an *individual basis*. If the client provides food for the caregiver, a credit may be taken for the *actual cost* of providing food." (emphasis added)). For example, Plaintiff Aboah testified that one client did not provide her with food. Defs.' Ex. J, Aboah Dep., ECF No. 149-11 at 9, Tr. 205:24–206:3 ("Q: Did Ms. Lawrence provide you with food when you provided care to Ms. Lawrence? A: No. Actually, even though I was just eating anything she was eating, but most [of] the time I brought my own food."). The reimbursement program may provide a starting point, *see Moon*, 248 F. Supp. 2d at 231, but there appears to be an absence of evidence about Plaintiffs' use of this program. This is ultimately a question for the jury when it calculates damages, and is outside of the issues raised at summary judgment. The Court's holding regarding food is limited to the following: the value of food provided to individual live-in caregivers is remuneration under 29 U.S.C. § 207(e), as a matter of law.

---

[7] The Court is not of the view that all food ever eaten by a live-in caregiver in the home of his or her client qualifies as remuneration. For example, if a live-in caregiver customarily purchases his or her own groceries, but shares pizza and a slice of cake with the client on their birthday, this would not qualify as "remuneration." Rather than a form of compensation for their job, this is more of a one-off occasion.

For these reasons, the Court holds that BrightStar violated the FLSA when it did not include the value of food and lodging in the regular rate of pay used to calculate Plaintiffs' overtime compensation. The question of Plaintiffs' damages for this violation remains for trial.

### 2. "Remuneration" under the CMWA

The Court agrees with BrightStar it is somewhat ambiguous whether the SAC brings an analogous overtime claim under the CMWA. *See* ECF No. 69 ¶¶ 11–15 (referencing only federal regulations); *but see id.* ¶ 112 (listing failure to add food and lodging to the regular rate of pay as a "violation of Connecticut law" but not citing an applicable statute or regulation). As BrightStar did not move to dismiss any potential CMWA overtime violation as inadequately pleaded—and does not seriously contend that it has not been on notice of such a claim throughout this protracted litigation—the Court concludes that Plaintiffs are pursuing such a claim and addresses it here.

A particular Connecticut regulation, Conn. Agencies Reg. § 31-60-3, had previously defined the deductions allowed against the minimum wage for the provision of food and lodging, but was repealed on in June of 2014. Conn. Public Act No. 14-187, Sec. 54. Regardless of whether state law allows employers to take deductions for food and lodging, however, it is a separate question whether state law would require those food and lodging to be accounted for when calculating the regular rate of pay used in determining overtime compensation.

Because the text of the Connecticut statute is the same as § 207(e) of the FLSA in all material respects, the Court grants summary judgment in Plaintiffs' favor as to their CMWA overtime claim as well. Connecticut General Statute Section 31-76b(1) provides that "[t]he 'regular rate' at which an employee is employed shall be deemed to include all *remuneration* for employment paid to, or on behalf of, the employee." (emphasis added). *Compare* 29 U.S.C. 207(e) (defining the "regular rate" as "all remuneration for employment paid to, or on behalf of, the

employee"). Accordingly, "[t]he regular rate under the CMWA is calculated in the same manner as the regular rate is calculated under the FLSA." *Kinkead v. Humana at Home, Inc*., 450 F. Supp. 3d 162, 183–84 (D. Conn. 2020) (citing *Williams v. Gen. Nutrition Ctrs., Inc.*, 326 Conn. 651, 659 (2017)). For the reasons described above, food and lodging provided to live-in caregivers falls comfortably within the CMWA's definition of "remuneration." Because there is no basis to conclude the textual analysis would be meaningfully different under Connecticut law, the Court grants summary judgment in Plaintiffs' favor with respect to its CMWA overtime claims as well.

Finally, the Court need not address BrightStar's motion to decertify the collective action conditionally certified only on this claim. There are no opt-in Plaintiffs due, in large part, to Attorney Egbarin's improper contact with potential opt-in class members. The period for any other opt-in plaintiffs to join the action has closed. It is therefore unnecessary to decertify the collective.

B. <u>Sleep Time Claims</u>

It is undisputed that BrightStar paid its live-in caregivers, including Plaintiffs, thirteen hours per twenty-four hour shift, excluding eight hours for sleep time (and three hours for meal/break time). BrightStar contends that the sleep time was properly excluded from pay under both the FLSA and CMWA, and that Plaintiff Aboah and Plaintiff Stewart have not met their burden of proof with regard to any purported sleep time interruptions. Plaintiff has cross-moved for summary judgment, arguing that there was no written agreement to exclude sleep time under the CMWA, and that BrightStar did not act in good faith by excluding sleep time absent a written agreement.

As explained below, the Court first finds there is a genuine dispute of material fact as to whether that BrightStar and Plaintiffs entered into a bona fide agreement to exclude sleep time under the FLSA. A reasonable jury may find that the sleep time policy was unilaterally imposed

by BrightStar, without Plaintiffs' consent, and therefore was not an *agreement*.  Second, the Court holds that the CMWA requires that an agreement to exclude sleep time be in writing; it is not a mere recordkeeping requirement.  The Court agrees with Plaintiffs that there is no genuine dispute BrightStar lacked a written agreement, and has therefore violated the CMWA.  But it cannot find, conclusively, that BrightStar did not act in good faith in excluding sleep time absent that written agreement, such that it is liable for additional liquidated damages.  This issue must be decided by the jury.  Finally, the Court finds that Plaintiff Stewart and Plaintiff Aboah cannot meet their evidentiary burden to show purported interruptions to their sleep time.  As a result, Plaintiffs may proceed with their FLSA sleep time claims at trial only on a theory that there was not a valid agreement to exclude sleep time.

*1.   Agreement to Exclude Sleep Time*

a.   Legal Standard

Sleep, as a general matter, is considered "work" for FLSA and CMWA purposes, if the employee is required to be on duty.  *See* 29 C.F.R. § 785.21.  If the employee is required to be on duty for twenty-four hours or more, the employer and the employee may agree to exclude "a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and employee can usually enjoy an uninterrupted night's sleep."  29 C.F.R. § 785.22(a).  For purposes of the FLSA, the agreement may be either express or implied, and may, but need not be, in writing.[8]  *See* U.S. DOL, Field Assistance Bulletin No. 2016-1, Exclusion of Sleep Time from Hours Worked by Domestic Service Employees 5 (Apr. 25, 2016), available at

---

[8] The Court rejects BrightStar's assertion that 29 C.F.R. § 785.23, titled "Employees residing on employer's premises or working at home," is the only regulation governing the compensation of sleep time for live-in caregivers.  Rather, 29 C.F.R. § 785.22, titled "Duty of 24 hours or more," also applies here.

https://www.dol.gov/whd/FieldBulletins/fab2016_1.pdf (last visited July 24, 2024) ("The reasonable agreement must be an employer-employee agreement and not a unilateral decision by the employer, and it should normally be in writing in order to preclude any possible misunderstanding of the terms and conditions of an individual's employment." (cleaned up)).

If the employer and employee have an agreement to exclude sleep time but "the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked."  29 C.F.R. § 785.22(b).  If the employee "cannot get at least 5 hours' of sleep" as a result of the interruption or interruptions, "the entire scheduled [sleep] period is working time." *Id.*

The CMWA sleep time provision is similar in material respects, except that the agreement to exclude sleep time from hours worked must be "in writing."  Conn. Gen. Stat § 31-76b(2)(D); *see also Kinkead*, 450 F. Supp. 3d at 180 ("If there is an agreement in writing for a regularly scheduled sleep period and if the employee is allowed time for meals, then live-in HHWs may be credited with as few as 13 hours per live-in shift rather than 24 hours."); *Headly v. Liberty Homecare Options, LLC*, No. 3:20-CV-00579 (OAW), 2022 WL 21814, at *1 (D. Conn. June 16, 2022) ("Connecticut law . . . allows third-party employers of individuals providing companionship to exclude a 'regularly scheduled sleeping period' . . . provided that the employer and employee agree to the exclusion (the unpaid time) in writing." (quoting Conn. Gen. Stat. § 31-76b(2)(D)); *Modise v. CareOne Health Servs. LLC*, No. 3:20-cv-765-SVN, Jury Inst., ECF No. 216 at 22 (D. Conn. Nov. 2, 2023) (instructing that, under the CMWA, "[i]f the parties do not agree in writing to exclude sleep time, the employee must be paid for eight hours of sleep time.").

b.  Discussion

Beginning with the FLSA, BrightStar has not conclusively shown that there was a consensual agreement to exclude sleep time between BrightStar and Plaintiffs, as opposed to the

one-sided imposition of a company policy.  BrightStar describes how the company policy is explained to new hires during orientation, how Plaintiffs received a handbook containing the sleep time policy, and how the policy is reflected in the Plaintiffs' paychecks and the contracts BrightStar enters with clients.  But it is a question for the jury whether the passive acceptance of the company policy through onboarding and continued employment amounted to an implied agreement under the FLSA.  As far back at 1988, the DOL established the principle that the agreement "must be the result of an employee-employer agreement and not a unilateral decision of the employer."  *See* U.S. DOL, Hours Worked in Residential Care (Group Home) Establishments – Sleep Time and Related Issues – Enforcement Policy, 1988 WL 614199, at *2 (June 30, 1988).  BrightStar acknowledges as much in its handbook, which states that "[a]ny agreement . . . must meet the requirement of federal and applicable state law and be an employer-employee agreement, *not a unilateral decision by the employer*."  Defs.' L.R. 56(a)2 St. ¶ 19 (emphasis added).

There is also no evidence of a written sleep time agreement between BrightStar and Plaintiffs until July 23, 2020, when Plaintiff Stewart signed the Live-In Care Agreement shortly before she left the company.  Pls.' Ex. 8, ECF No. 151-8.  BrightStar admits the employee handbook did not constitute a written agreement, and that Plaintiff Aboah and Plaintiff Stewart (before July 23, 2020) did not sign a voluntary agreement excluding sleep time with BrightStar, despite that its handbook stated that any such agreement would be in writing.  Defs.' L.R. 56(a)2 St. ¶¶ 25–31; ECF No. 149-5 at 5 (handbook provision stating that the agreement to deduct sleep time "will be in writing").  Although Plaintiffs may have signed certifications of other employee policies, they did not relate to sleep time.  Defs.' Ex. P, ECF No. 152-17 at 6–11; Defs.' Ex. Q, ECF No. 162-4 at 2–10.  This was confirmed by BrightStar Director of Operations Stephanie Ward's deposition testimony.  Ward Dep., ECF No. 151-4 at 23, Tr. 83:1–3 (testifying that "sleep

time was discussed, but if you're asking for a signed sleep agreement, we did not have that"). Because a reasonable jury may find that Plaintiffs did not agree to exclude sleep time from their pay under the FLSA, BrightStar's summary judgment motion is denied on this issue.

With respect to the CMWA, contrary to BrightStar's assertions, a written agreement is required to exclude sleep time under this state law.  Conn. Gen. Stat. § 31-76b(2)(D) provides that in the case of a caregiver who "is required to be present at a worksite for a period of not less than twenty-four hours, such individual and his or her employer may agree *in writing* to exclude a regularly scheduled sleeping period of not more than eight hours from hours worked . . . ." (emphasis added).  Consistent with this language, courts have interpreted the CMWA as imposing a requirement that the agreement to exclude sleep time is in writing, though this is not required under the FLSA.  *See Kinkead*, 450 F. Supp. 3d at 180; *Headly*, 2022 WL 21814, at *1; *Modise*, No. 3:20-cv-765-SVN, Jury Inst., ECF No. 216 at 22.

The Court disagrees with BrightStar that the presence of a written agreement is a recordkeeping requirement for which there is no private cause of action for enforcement.  Rather, it is an affirmative obligation before excluding sleep time under the CMWA.  BrightStar cites to *Nettleton v. C & L Diners, LLC*, 219 Conn. App. 648 (2023), where the Connecticut Appellate Court held that a restaurant's failure to maintain written records was not a condition precedent to taking a tip credit against a waitress's wage, and that the applicable regulation, Connecticut Department of Labor Regulation § 31-62-E3, did not provide a private cause of action.  The Connecticut Appellate Court in *Nettleton* applied a non-exhaustive six-factor test for determining whether a provision of law is "mandatory," for which noncompliance gives rise to a private cause of action, or "directory," for which it does not:

> (1) whether the statute expressly invalidates actions that fail to comply
> with its requirements or, in the alternative, whether the statute by its

terms imposes a different penalty; (2) whether the requirement is stated in affirmative terms, unaccompanied by negative language; (3) whether the requirement at issue relates to a matter of substance or one of convenience; (4) whether the legislative history, the circumstances surrounding the statute's enactment and amendment, and the full legislative scheme evince an intent to impose a mandatory requirement; (5) whether holding the requirement to be mandatory would result in an unjust windfall for the party seeking to enforce the duty or, in the alternative, whether holding it to be directory would deprive that party of any legal recourse; and (6) whether compliance is reasonably within the control of the party that bears the obligation, or whether the opposing party can stymie such compliance.

*Id.* at 668 (quoting *Electrical Contractors, Inc. v. Ins. Co. of the State of Penn.*, 314 Conn. 749, 757 (2014)).

Applying these factors, the Court is persuaded that the "in writing" requirement in Conn. Gen. Stat. § 31-76b(2)(D) is mandatory. Beginning first with the statutory language, the provision *does* expressly provide that hours not excluded by an agreement are considered "hours worked." Section 31-76b(2)(A) defines "[h]ours worked" as "all time during which an employee is required by the employer to be on the employer's premises . . . or to be at the prescribed work place." This creates a default that all hours required to be "at the prescribed work place" are "hours worked." Applying this definition, when § 31-76b(2)(D) refers to caregivers "*required to be present at a worksite* for a period of not less than twenty-four consecutive hours," it means that all those twenty-four hours are "hours worked" absent a written agreement otherwise. Moreover, although § 31-76b(2)(D) is stated in the affirmative rather than the negative, the full statutory context shows that hours required to be at the "prescribed work place" and not excluded through a written agreement are considered hours worked.

As for the remaining considerations, the requirement that the agreement be in writing is one of substance, its enforcement does not result in an unjust windfall, and it is firmly within the employer's control. The U.S. DOL has previously advised that agreements to exclude sleep time

"should normally be in writing to preclude any possible misunderstanding of the terms and conditions of an individual's employment."  1988 Memorandum, 1988 WL 614199, at *3. BrightStar even stated in its own handbook that "[t]his agreement will be in writing."  Defs.' L.R. 56(a)2 St. ¶ 19.  Nonetheless, there is no evidence that either Plaintiff entered into a *written* agreement to exclude sleep time until July 23, 2020, when Plaintiff Stewart did so.  Defs.' L.R. 56(a)2 St. ¶ 19.  BrightStar's theory that Connecticut legislators have amended other provisions of Connecticut law to conform to FLSA standards does not persuasively counsel otherwise.  *See* ECF No. 149-1 at 45.  In short, the written requirement in Conn. Gen. Stat. § 31-76b(2)(D) is plainly distinguishable from the regulatory recordkeeping requirement at issue in *Nettleton*.

Failure to compensate live-in caregivers for sleep time absent a written agreement to do so entitles Plaintiffs to payment of unpaid sleep time under the CMWA.  The Court therefore grants Plaintiffs' summary judgment motion on this basis.

### 2.  Good Faith (CMWA)

Having found that BrightStar and Plaintiffs did not enter into a written agreement to exclude sleep time, the Court considers Plaintiffs' arguments that BrightStar did not act in good faith in this regard.  If BrightStar is found not have acted in good faith, it must pay Plaintiff twice the amount of any unpaid wages, as liquidated damages.  *See* Conn. Gen. Stat. § 31-68(a) (providing that an employee is entitled to recover "(1) twice the full amount of such minimum wage or overtime wage less any amount actually paid to him or her by the employer . . . or, (2) if the employer establishes that the employer had a good faith belief that the underpayment of such wages was in compliance with the law, the full amount of such minimum wage or overtime wage less any amount actually paid to him or her by the employer").  The burden is on the employer to

show that it acted in good faith in the underpayment of wages. *See Mmolawa v. Diligent Enters.*, *Inc.*, No. 19-cr-300 (VLB), 2020 WL 7190819, at *11 (D. Conn. Dec. 7, 2020).

The statute itself defines "good faith" as a "belief" that the employer's action "was in compliance with the law." Conn. Gen. Stat. § 31-68(a). Connecticut courts have relied on decisions interpreting the analogous provision in the FLSA, and adopted the "good faith" standard articulated by the Second Circuit. "[G]ood faith" is "an honest intention to ascertain what the [law] requires and to comply with it." *Stevens v. Vito's By The Water, LLC*, HHDCV156062506S, 2017 WL 6045302, at *5 (Conn. Super. Ct. Nov. 9, 2017) (unpublished) (quoting *Reich v. Southern New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)). Good faith requires "more than ignorance of the prevailing law or uncertainty about its development," but rather "active steps to ascertain the dictates of the [law] and then mov[ing] to comply with them." *Id.* (same).

The Court finds there is a genuine dispute whether BrightStar acted in good faith under the CMWA in excluding eight hours of sleep time from pay absent a written agreement to do so. BrightStar argues that it acted in good faith primarily because "Connecticut employers often look to the FLSA with respect to ensuring compliance with state wage and hour laws," and the FLSA does not require a written agreement to exclude sleep time. ECF No. 152 at 26. For the reasons discussed *supra*, the FLSA and CMWA differ in this regard. To the extent BrightStar claims it relied on the Revised Joint Guidance Issued by the DSS and CT DOL in January of 2017, the bulletin itself states it "provides guidance regarding the impact of the *federal FLSA* on the provision of agency-based live-in services to recipients of Connecticut Medicaid Home and Community-Based waivers"; it is silent about the CMWA. Revised Joint Guidance Issued by DSS and CTDOL Regarding USDOL's Home Care Final Rule, ECF No. 151-7, at 1 (emphasis added).

The portion discussing agreements to exclude sleep time references only 29 C.F.R. § 552.102, a federal regulation. *Id.* at 2–3.

Although this may tend to show that BrightStar did not act in good faith, Plaintiffs fail to identify any cases where courts have held that similar evidence warrants such a finding at the summary judgment stage. To the contrary, Plaintiffs cite two cases where courts *denied* defendants' motions for partial summary judgment as to whether their alleged violations of the CMWA were in good faith. *See Maphutha v. Diligent Enters., Inc.*, No. 19-cv-1411 (VLB), 2021 WL 3493646, at *11 (D. Conn. Aug. 9, 2021); *Mmolawa*, 2020 WL 7190819, at *11. This only underscores that the question of "good faith" is best left for a jury. Plaintiff cannot rely on the fact that BrightStar violated the CMWA to prove lack of good faith, alone.

For these reasons, the Court denies Plaintiffs' motion for partial summary judgment on the issue of whether BrightStar acted in good faith under the CMWA. This issue remains for trial.

### 3. Individual Sleep Disruptions

The Court has thus far foreclosed BrightStar's argument that it did not violate the CMWA. With respect to the alleged FLSA violation, the jury must decide whether Plaintiffs agreed with BrightStar to exclude sleep time from their pay. In the event that a jury were to find that BrightStar and Plaintiffs *did* properly agree to exclude sleep time under the FLSA, Plaintiffs may nonetheless be entitled to unpaid wages on account of interruptions to that sleep period. BrightStar seeks summary judgment that such claims would be deficient, because it did not have actual or constructive notice of any sleep time interruptions experienced by Plaintiff Stewart, and because both Plaintiff Stewart and Plaintiff Aboah cannot meet their evidentiary burden to provide a reasonable basis for calculating damages. For the following reasons, the Court agrees that, although it appears BrightStar may have had actual or constructive knowledge of sleep time

disruptions experienced by Plaintiff Stewart, neither Plaintiff Stewart nor Plaintiff Aboah have met their evidentiary burden.  Therefore, at trial, Plaintiffs may only succeed on their FLSA sleep time claim if the jury finds they did not agree to exclude their sleep time.  If the jury finds instead that Plaintiffs agreed to exclude their sleep time, Plaintiffs cannot pursue a theory that they should be paid for time when their sleep was interrupted.

a.  Legal Standard

A dispute for unpaid wages under the FLSA and CMWA is generally governed by the burden-shifting framework set forth in *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680 (1946); *see also Schoonmaker v. Lawrence Brunoli, Inc.*, 265 Conn. 210, 243 (2003) (applying *Anderson* to a CMWA claim).  "To establish liability under the FLSA on a claim for unpaid [wages], a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work."  *Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) (citing *Anderson*, 328 U.S. at 686–87); *see also Modise v. CareOne Health Servs., LLC*, 638 F. Supp. 3d 159, 174 (D. Conn. 2022).

"An employer's actual or imputed knowledge that an employee is working is a necessary condition to finding the employer suffers or permits that work."  *Chao*, 514 F.3d at 287.  This requirement applies equally to employees who do not work at the employer's premises.  *See Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998) ("Work performed off-site must be counted as time worked only if the employer knows or has reason to believe that work is being performed.").

The plaintiff-employee must also show, under *Anderson*, that "there is a reasonable basis for calculating damages assuming that a violation has been shown."  *Kuebel*, 643 F.3d at 364–65.  This burden "is low and can be met by that employee's recollection alone." *Arasimowicz v. All*

*Panel Sys., LLC*, 948 F. Supp. 2d 211, 224 (D. Conn. 2013).  If the employee satisfies this initial burden, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687–88.  "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688.

b.   Plaintiff Stewart

First, Plaintiffs have identified specific evidence which creates a genuine dispute over whether BrightStar had actual or constructive knowledge of uncompensated work performed by Plaintiff Stewart. There is evidence that Plaintiff Stewart personally spoke with supervisors about interruptions to her sleep during the relevant period, and also reported interruptions through the MABS system.  First, in her interrogatory responses, Plaintiff Stewart states that she informed BrightStar's supervising nurse Jeanne Clark, who would visit her on the job about once every month, about sleep disruptions.  Defs.' Ex. L, Stewart Interrog. 13, ECF No. 149-13 at 16.  Plaintiff Stewart stated that, during such visits, "I would say that at night [the client] calls, she was needy and had to be there for her." *Id.*  Nurse Clark, having been made aware of the interruptions, allegedly advised Plaintiff Stewart that "when [BrightStar's aide] Millie visits I should use the time Millie's there for my personal purposes." *Id.*  Plaintiff Stewart responded to Nurse Clark that this was an inadequate solution, because "[BrightStar's aide] Millie doesn't stay long when she visited," "insisted that she will be there for 20 or 45 minutes," such that Plaintiff Stewart "was always rushing to return back to the client's residence." *Id.*  In addition to her conversations with Nurse Clark, there is evidence that Plaintiff Stewart also "reported these interruptions on the electronic timesheet (MABS)," though she stopped doing so "because they ignore the reports I

made earlier." Stewart Interrog. 5, ECF No. 149-13 at 10.  Taken together, this may support a jury finding that BrightStar had actual or constructive knowledge of disruptions to Plaintiff Stewart's sleep time to tend to her client.

There is no requirement that actual or constructive knowledge of unpaid work always be provided through an employer's formal reporting systems.  The Court is not bound by the out-of-circuit cases cited by BrightStar, to the extent they suggest that "if an employer established a reasonable process for an employee to report uncompensated work time, the employer is not liable for non-payment if the employee fails to follow the established process." *White v. Baptist Mem'l Health Care Corp.*, 669 F.3d 869, 876 (6th Cir. 2012).  Rather, in *Kuebel v. Black & Decker, Inc.*, the Second Circuit reversed a district court for relying too heavily on the fact that a live-in caregiver plaintiff never made a formal complaint; it was sufficient that the plaintiff testified that he had "specifically complained to his supervisor" on several occasions.  643 F.3d at 365.  While the lack of a formal complaint could "conceivably hurt [the plaintiff's] credibility at trial," it did not warrant summary judgment on the issue of actual or constructive notice.  *Id.*  Similarly, although nothing prohibits a company from having a formal time-keeping policy, *see Desilva v. North Shore-Long Island Jewish Health System, Inc.*, 27 F. Supp. 3d 313, 322 (E.D.N.Y. 2014), such a system does not preclude claims for time worked but not reported on that system.  The absence of such formal reports may be relevant to the determination of whether an employer had actual or constructive knowledge of unpaid work performed, but it is not conclusive.

Although BrightStar is therefore not entitled to a summary judgment holding that it lacked actual or constructive knowledge of Plaintiff Stewart's interruptions, the Court agrees with BrightStar that Plaintiff Stewart has not met her initial burden under *Anderson* to produce evidence from which a reasonable jury could draw a just and reasonable inference of the actual hours

worked.  In a June 15, 2020, email, Plaintiff Stewart confirmed that, when asked "how many times I've had to be awakened to attend the patient," "as much as I tried, I cannot possibly remember ever detail so far back."  June 15, 2020, Email, ECF No. 149-18 at 1.  Although she references having made reports of the interruptions on MABS in her interrogatory response, evidence of such appears to be missing from the record.  While Plaintiff's initial burden under *Anderson* is low, and Plaintiff's difficulty recollecting is understandable, the evidence is highly vague such that determination of damages would be guesswork.  Therefore, the Court grants BrightStar summary judgment to the extent Plaintiff Stewart pursues a theory of liability based on sleep time interruptions.

c.  Plaintiff Aboah

As to Plaintiff Aboah, BrightStar does not claim it lacked actual or constructive knowledge of unperformed work.  Rather, BrightStar rests on an argument that Plaintiff Aboah would be unable to meet her burden at *Anderson*'s first stage of providing a reasonable basis upon which a jury could calculate damages.  For reasons similar to Plaintiff Stewart, the Court agrees.  In her deposition testimony, Plaintiff Aboah only testified that she "worked 24/7" when asked about sleep time interruptions.  Defs.' Ex. J, Aboah Dep., ECF No. 149-11 at 3, Tr. 15:16–17 ("I worked 24/7, this is what I know."); *id.* 16:7–11 ("I worked 24/7 and more . . . .").  At most, Plaintiff Aboah points to an interrogatory answer that states she "[didn't] have time to take a break."  ECF No. 154 at 34 (quoting Defs' Ex. P, Aboah Interrog. 1, ECF No. 149-17 at 6).  This is highly conclusory, and is insufficient evidence from which a reasonable jury could calculate damages in Plaintiff Aboah's favor.  Therefore, the Court grants BrightStar summary judgment to the extent Plaintiff Aboah pursues a theory of liability based on sleep time interruptions.

C.  Meal Time

BrightStar also seeks summary judgment on Plaintiffs' meal time claims.  For the following reasons, the Court agrees there is absence of evidence upon which a reasonable jury could find in Plaintiff Stewart and Plaintiff Aboah's favor regarding meal time interruptions.  Plaintiffs may proceed on a theory that there was no agreement to exclude meal time under the FLSA, however.

1.  *Private Cause of Action for CMWA Meal Time Violations*

At the threshold, BrightStar argues that Plaintiffs do not have a private cause of action under Connecticut law for meal time violations.  BrightStar claims Conn. Gen. Stat. § 31-51ii(a) is the relevant statute.  Conn. Gen. Stat. § 31-51ii(a) provides that "[n]o person shall be required to work for seven and one-half or more consecutive hours without a period of at least thirty consecutive minutes for a meal," which "shall be given at some time after the first two hours of work and before the last two hours."  The statute authorizes the Labor Commissioner to enact regulations that exempts employers from this requirement (1) where "the duties of a position may be performed by one employee," or (2) where "the employer employs less than five employees on a shift at a single place of business."  Conn. Gen. Stat. § 31-51ii(c).  It authorizes "civil penalties," but does not explicitly create a private cause of action.  Conn. Gen. Stat. § 31-51ii(g).  Because there is no explicit cause of action, and because Plaintiffs would apparently fall under the two identified exceptions, BrightStar argues that Plaintiff cannot prove a violation of Connecticut meal time law.

The Court agrees with Plaintiffs, however, that the relevant statute is not Conn. Gen. Stat. § 31-51ii(a), but Conn. Gen. Stat. § 31-76b(2)(A).  Conn. Gen. Stat. § 31-76b(2)(A) defines "hours worked" for CMWA purposes and states that "time allowed for meals shall be excluded [from hours worked] *unless the employee is required or permitted to work*." (emphasis added).  It is

therefore plain that interruptions to unpaid meal time, in which an "employee is required or permitted to work," must be paid.  Indeed, it is "axiomatic" that employees must be paid for all time they work.  *See Headly*, 2022 WL 2181410, at *1.  Conn. Gen. Stat. § 31-51ii(a) refers the scheduling of the meal breaks, and does not preclude a claim under Conn. Gen. Stat. § 31-76b(2)(A).  For these reasons, Court finds that there is a private cause of action to support Plaintiffs' claims of interrupted meal time under the CMWA.

### 2.  Interruptions to Meal Time

Like sleep time, an employer and employee may agree to exclude break time or meal time from hours worked under the FLSA when the employee is required to be on duty for 24 hours or more.  *See Headly*, 2022 WL 2181410, at *1 (citing 29 C.F.R. § 785.22(a)).  "Bona fide meal periods" are "rest periods" where "[t]he employee must be completely relieved from duty for the purposes of eating regular meals," though "[i]t is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed form duties during the meal period."  29 C.F.R. § 785.19.

Unlike sleep time, Connecticut law does not require that the agreement to exclude meal periods is in writing.  In fact, that default rule under Connecticut law is that meal time is *excluded*, and there is no exception for employees who are on the job for twenty-four hour shifts.  *See* Conn. Gen. Stat. § 31-76b(2)(A) (stating that "time allowed for meals shall be excluded unless the employee is required or permitted to work").  Nonetheless, it is well established that "[u]nder both state and federal law, if the employee is called to duty during their meal break or sleeping period, then the time spent working must be compensated."  *See Headly*, 2022 WL 2181410, at *1 (citing 29 C.F.R. §§ 785.22(b), 785.19 and Conn. Gen. Stat. § 31-76b(2)).

BrightStar does not contend that there was a valid agreement to exclude meal time under the FLSA. *See* 29 C.F.R. § 785.22. Therefore, such a claim remains live. Rather, BrightStar moves for summary judgment on the ground that it did not have actual or constructive knowledge of any interruptions to Plaintiff Stewart's break time, and that both Plaintiff Stewart and Plaintiff Aboah fail to meet their initial burden under *Anderson* to prove that their meal time was interrupted.

There is an absence of evidence on which a reasonable jury could find in Plaintiffs' favor on the meal time claims, for similar reasons as the sleep time claims. Although it appears Plaintiff Stewart may have put supervisors on notice about interruptions to her meal time, both her testimony and Plaintiff Aboah's testimony is highly vague. At most, Plaintiff Stewart stated in an interrogatory answer that she does not have any personal time because when the BrightStar aide visits, she only stayed for 20 or 45 minutes. *See* Defs.' Ex. L, Stewart Interrog. 13, ECF No. 149-13 at 16. When asked if "during [her] entire tenure with BrightStar, [she] never ate breakfast, lunch or dinner," Plaintiff Aboah responded "Yes, I was never allowed to." Defs.' Ex. J, Aboah Dep., ECF No. 149-11 at 5, Tr. 39:3–9. BrightStar is correct that such an assertion is physiologically implausible. A jury cannot, from this evidence, draw any just and reasonable inference as to the damages to which Plaintiffs would be entitled. Accordingly, BrightStar is entitled to summary judgment on Plaintiffs' FLSA and CMWA meal time claims, to the extent they rest on purported interruptions. Plaintiffs may only proceed on a theory that there was no agreement to exclude meal time under the FLSA.

## V.      CONCLUSION

For the reasons described above, the Court GRANTS Defendant Moore's motion for summary judgment, GRANTS IN PART and DENIES IN PART BrightStar's motion for summary judgment and decertification of the FLSA collective, and GRANTS IN PART and DENIES IN PART Plaintiffs' motion for partial summary judgment.

Defendant Moore is dismissed from this action.  The Clerk of Court is directed to terminate Defendant Moore from this case.

The Court will convene a scheduling conference to set dates for trial and pretrial submissions on Plaintiffs' remaining claims—(1) FLSA and CMWA overtime claims for failure to use the proper regular rate in overtime compensation that has already been paid; (2) FLSA sleep time claims based on lack of an agreement; (3) CMWA claims for double damages, concerning whether BrightStar acted in good faith in failing to document an agreement to exclude sleep time in writing; and (4) FLSA claims based on lack of an agreement to exclude meal time—and damages.

**SO ORDERED** at Hartford, Connecticut, this 26th day of July, 2024.

 _/s/ Sarala V. Nagala_
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE